UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANYELL THOMAS,

    Plaintiff,

v.                                            Case No. 2:08-cv-295
                                                  HON. ROBERT HOLMES BELL
DAVID BERGH, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Danyell Thomas, a former inmate, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Warden David Bergh, Regional Prisoner Affairs Director James MacMeekin, Inspector Jeff Contreras, Captain Anthony Immel, Resident Unit Manager Denver McBurney, Assistant Resident Unit Manager Thomas Salo, Sergeant Karen Prunick, Sergeant Daniel W. O'Dell, Mandy Sebley R.N., Corrections Officer Jeff Cromell, Corrections Officer John Cromell, Corrections Officer Kris Petosky, Corrections Officer Tracey Bergh, Corrections Officer Joseph Naeyart, Corrections Officer Joseph Suardini, Corrections Officer Daniel Hinsa, Corrections Officer Randy Ollis, and Corrections Officer Jeffrey Drushel.

Plaintiff's complaint alleges that he was confined at the Alger Maximum Correctional Facility (LMF) during the pertinent time period. Plaintiff states that on December 24, 2006, while he was working in the kitchen, he was approached by Defendants Immel and Petosky and ordered to remove his kitchen whites because he was being taken to segregation. Plaintiff was told that he had assaulted someone and was ordered to turn around and allow himself to be placed in handcuffs.

Plaintiff denied any wrongdoing and complained that he was being taken to the "hole" for nothing. However, Plaintiff agreed to walk to segregation.

Plaintiff states that as he was exiting the kitchen, he was confronted by Defendant Jeff Cromell, who blocked his path. Plaintiff turned to see Defendants Immel and Petosky approaching from behind and other officers rushing at him from every direction. Plaintiff's wrist was grabbed by Defendant Jeff Cromell and was wrenched behind his back. Plaintiff snatched his wrist from Defendant Jeff Cromell's grasp and stated that he would walk to segregation. Plaintiff was then wrestled to the ground by Defendants Jeff Crommell, Immel and Petosky.

Plaintiff states that other Defendants had rushed to the area and that Defendants Immel, Petosky, Jeff Cromell, John Cromell, Drushel and Suardini began pulling Plaintiff in every direction while bending his fingers back. Plaintiff claims that he was not resisting and was yelling that none of this was necessary because he was being taken to the "hole" for "some nonsense." Leg restraints and handcuffs were placed on Plaintiff and he was jerked to his feet, lifted by the sides of his pants and arms, and was carried to a shower stall in segregation. Plaintiff asserts that Defendants continued to punch and kick him, which resulted in injuries to his eye, his face and other parts of his body. Plaintiff was placed in a shower stall, where he noticed that he was bleeding and could barely open his eye.

Plaintiff states that after a time, he was approached by Defendant Sebley, who stated that she could see blood on his face despite the dimness of the shower unit and asked Plaintiff if he needed medical attention. Plaintiff said that he did and asked to have photographs taken of his injuries. Defendant Sebley stated that she did not have the authority to have photographs taken and left after telling Plaintiff to kite if he decided he wanted medical assistance. Plaintiff attaches

"testimony" of Defendant Sebley[1] to his complaint, in which she testifies that she saw a "little bit" of blood on Plaintiff's face, but that it was not dripping onto the floor, that Plaintiff was very agitated and was swearing and yelling, and that he refused medical treatment. (*See* Plaintiff's Exhibit B, pp. 65-66.)

A short time later, Plaintiff was approached by Defendant Tracey Bergh and Corrections Officer Wickstrom, who unshackled and strip searched Plaintiff and told him they were taking him across the hall to another cell. Plaintiff expressed concern that the cell had not been sanitized and that it lacked a bedroll, and stated that he needed medical attention. Plaintiff was redressed and placed back in restraints and was left in the shower stall. Shortly thereafter, Defendant Prunick came to the stall and asked Plaintiff why he would not allow himself to be placed in the cell. Plaintiff again complained about the conditions of the cell and asked for medical attention. Defendant Prunick told him to go into the cell and that she would ensure he received what was needed. Plaintiff complied and was placed in cell C-122.

A few hours later, Plaintiff was taken to the hearing room to be interviewed by the Michigan State Police, where Trooper Cole asked Plaintiff what had occurred. Plaintiff explained what had happened and Trooper Cole took multiple photographs of Plaintiff's injuries. After Plaintiff was returned to his cell, Defendant Prunick reviewed six major misconduct reports with Plaintiff, and refused to call health services for Plaintiff.

On December 27, 2006, Plaintiff spoke to Defendant Salo and was finally given grievances, medical kites and stationary. Plaintiff filed a grievance regarding the excessive force and sent letters of complaint to Defendants David Bergh and Inspector Contreras. On January 19, 2007,

---

[1] Also spelled Sebaly.

Plaintiff was reviewed on the grievance by Defendant McBurney, who listened to Plaintiff's explanation, slammed Plaintiff's cell window shutter, and walked away. In response to Plaintiff's step I grievance, which is attached to Plaintiff's complaint, Defendant McBurney stated:

> Staff involved in this incident including the Cedar Unit bubble officer have been contacted. Captain Immel states that no direction was given at any time to attack you in any manner. Escorting officers, under the direction of Captain Immel, used only the amount of force necessary to control your assaultive and disruptive behavior. You not only resisted the efforts of staff to restrain you initially but you continued to resist throughout the entire escort process. Staff are found to have acted reasonable [sic] and appropriately in response to your disruptive behavior.

(*See* Plaintiff's Exhibit C.)

Plaintiff claims that Defendants' conduct violated his Eighth Amendment rights. Plaintiff seeks damages and equitable relief.

On January 5, 2009, the court dismissed Plaintiff's complaint for failure to state a claim (docket #3 and #4). Plaintiff appealed and the Sixth Circuit reversed the dismissal as to Defendants Immel, McBurney, Salo, Prunick, Sebley, Jeff Cromell, John Cromell, Petoskey, Tracey Bergh, Naeyart, Suardini, and Drushel (docket #8). Currently before the court is a Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), and/or Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56, filed by Defendants Immel, McBurney, Salo, Prunick, Jeffrey Cromell, John Cromell, Kris Petoskey, Tracy Berg, Joseph Naeyart and Joseph Suardini (docket #36).[2] The time for filing a response has elapsed, and Plaintiff has failed to file such a response. Therefore, the matter is ready for decision. Because Defendants have asked that the Court consider evidentiary

---

[2]To date, Mandy Sebley and Jeffrey Drushel have not been served.

materials beyond the pleadings, the standards applicable to summary judgment apply. *See* Fed. R. Civ. P. 12(b).

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Initially, Defendants claim that Defendants McBurney, Prunick, John Cromell, Kris Petoskey, Tracy Berg and Joseph Nayert are entitled to summary judgment due to Plaintiff's failure

to exhaust his administrative remedies. In addition, Defendants state that Plaintiff failed to exhaust his claims regarding the denial of medical care against all Defendants. A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PRLA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶ P. The

Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ X.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. *Id.* at ¶¶ T, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances. *Id.* at ¶ GG. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ X. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ." *Id* at ¶ HH.

Plaintiff asserted that he filed a complaint regarding the events of December 24, 2006, and the persons involved. Plaintiff attached a copy of this grievance, LMF 07-01-42-17i, to his complaint. In the grievance, Plaintiff states:

1. On 12-24-06 While being escorted to Cedar Unit, [Captain] Immel directed the (L.M.F.) staff members to attack me. As soon as we entered the building.

2. As directed staff member Cromell, Petosky & Suardini took turns assaulting me in the entrance of Cedar Unit.

3. Evidence of the assault was taken by Michigan State Police.

4. These actions by staff member [sic] was a clear violation of the Eighth Amendment and also Estate of Davis by Ostenfeld v. Delo, 115 F.3d 1388 (8th Cir. 1997). Plus violates the employee handbook unbecome [sic] actions of an officer [sic].

(*See* Docket #1, Exhibit C.)

It appears that Plaintiff pursued appeals on the above grievance to step III, thereby exhausting his claims regarding the alleged assault by Defendants Cromell, Petosky and Suardini, as directed by Defendant Immel. Defendants assert that because there is no mention of the need for medical care, or any mention of Defendants other than Defendants Cromell, Petosky and Suardini, as directed by Defendant Immel, those claims are properly dismissed. A review of the record shows that the grievance filed by Plaintiff during the pertinent time period did not exhaust his denial of medical care claims. Therefore, those claims against the Defendants are properly dismissed for failure to exhaust administrative remedies.

With regard to Plaintiff's claims against defendants Immel, Cromell, Petosky, and Suardini for excessive force, defendants state that there is no genuine issue of material fact to support Plaintiff's assertions. The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits

conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id.*

The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley v. Albers*, 475 U.S. 312 (1986), should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Id.* (citing *Whitley*, 475 U.S. at 321). Under this standard, even deadly force may be constitutionally appropriate under certain circumstances. *Gravely v. Madden*, 142 F.3d 345, 348 (6th Cir. 1998).

The analysis of the degree of force used must be made in the context of the constant admonitions by the Supreme Court that courts must accord deference to prison or jail officials as they attempt to maintain order and discipline within dangerous institutional settings. *See, e.g.*, *Whitley*, 475 U.S. at 321-22. Plaintiff claims that Defendants used unnecessary force to take him to segregation. However, it is clear from the complaint that Plaintiff did not initially allow himself to be cuffed and argued with officers about being taken to segregation. Plaintiff asserts that he offered to "walk" to segregation, but states that he when he attempted to exit the kitchen without being cuffed, his path was blocked by Defendant Jeff Cromell. Plaintiff turned to see Defendants Immel and Petosky approaching from behind and other officers rushing at him from every direction.

Plaintiff's wrist was grabbed by Defendant Jeff Cromell and was wrenched behind his back. Plaintiff snatched his wrist from Defendant Jeff Cromell's grasp and again insisted that he would walk to segregation. Plaintiff was then wrestled to the ground by Defendants Jeff Crommell, Immel, and Petosky. Following this, Defendants carried Plaintiff to the segregation unit.

In support of their motion for summary judgment, Defendants offer the affidavits of defendants Petosky, Cromell, and Immel, as well as the critical incident reports relating to the alleged assault. Defendant Petosky attests that on December 24, 2006, Plaintiff physically assaulted another prisoner. Consequently, Plaintiff was ordered to remove his kitchen whites and return to his unit. Plaintiff became angry and started yelling in a very loud voice, which attracted the attention of other inmates in the area. After refusing to comply with staff orders, Plaintiff hit Defendant Cromell in the face and took a swing at Defendant Petosky, but missed actually hitting Defendant Petosky. In order to gain control of Plaintiff, Defendant Petosky and other staff took Plaintiff down to the floor. Plaintiff continued to resist staff during the time that restraints were applied, as well as while being escorted to the segregation unit. (Defendants' Exhibit 1, ¶¶ 3-9.)

In Defendant Petosky's critical incident report, it is noted that when Defendant Cromell asked Plaintiff to allow himself to be restrained, Plaintiff stated, "come on mother fucker, let's go" and struck Defendant Cromell in the right cheek with a closed fist. Plaintiff attempted to hit Defendant Petosky, so Defendants Petosky and Cromell grabbed Plaintiff and pushed him against the wall, bringing him down to the floor. Plaintiff was kicking and striking Defendant Petosky in the leg, while Defendant Immel and other staff assisted in restraining Plaintiff. Defendant Petosky

then delivered two hand strikes to the common peronial[3], but Plaintiff continued to resist. Plaintiff was taken to the shower stall on A-wing, and resisted staff the entire way. At one point, Plaintiff had to be placed on the floor and held down until he stopped resisting so that he could be placed in the shower. (Defendants' Exhibit 1-A.)

Defendant Jeffrey Cromell attests that when he arrived in the dining room on the date of the incident, Plaintiff was highly agitated and was refusing to comply with Defendant Petosky's order to allow himself to be cuffed. Instead, Plaintiff turned around and walked rapidly to the dining area. Defendant Jeffrey Cromell then approached Plaintiff and told him to drop his coat and turn around to be handcuffed. Instead, Plaintiff turned around and struck Defendant Jeffrey Cromell in the right cheek with his fist, causing a laceration on Defendant Jeffrey Cromell's cheek. Defendant Jeffrey Cromell then assisted Defendant Petosky with pushing Plaintiff against the wall and pulling him to the floor as a defensive measure. (Defendants' Exhibit 2, ¶¶ 4-8.) In the incident report, Defendant Jeffrey Cromell noted that Plaintiff had succeeded in kicking both Defendant Petosky and Defendant John Cromell while he was being taken to segregation. (Defendants' Exhibit 2-A.)

Defendant Immel attests that he was in the kitchen talking with another individual when Plaintiff was told to remove his kitchen whites. Plaintiff stated that he knew how to go to the hole and got into a fighting stance with feet set and clenched fists. Defendant Jeffrey Cromell ordered Plaintiff to place his hands behind his back, but Plaintiff walked briskly past him out into the dining area. Plaintiff was again ordered to allow himself to be cuffed, when he punched Defendant Jeffrey Cromell in the head. At this point, other staff began to respond and Plaintiff was

---

[3]"Peroneal" is of, relating to, or located near the fibula. (http://www.merriam-webster.com/medical/peroneal).

taken to the floor by Defendants Jeffrey Cromell, Petosky, and Immel. Plaintiff was placed in handcuffs and was escorted to Cedar unit, all the while yelling and resisting staff. Defendant Immel noted that while Plaintiff was being escorted, he kicked staff and was placed on the floor inside Cedar unit. Plaintiff was then placed back on his feet and escorted to the A wing shower stall. Plaintiff had blood on his face when placed in the shower stall. (Defendants' Exhibit C, ¶¶ 3-10.) In the critical incident report, Defendant Immel notes that Plaintiff was offered medical attention by R.N. Sebaly, but he refused. (Defendants' Exhibit 3-A, p. 2.)

In his affidavit and critical incident report, Defendant John Cromell indicates that while he was helping to take Plaintiff to the Cedar unit, Plaintiff yelled, struggled, and kicked him in the knee. (Defendants' Exhibits 4 and 4-B.) Defendants also refer to the testimony of Mandi Sebaly, R.N., which is attached to Plaintiff's complaint. Sebaly testified that she saw a "little bit" of blood on Plaintiff's face, but that it was not dripping onto the floor, that Plaintiff was very agitated and was swearing and yelling, and that he refused medical treatment. (*See* Plaintiff's Exhibit B, pp. 65-66.)

As noted above, Plaintiff has failed to file a response to Defendants' motion for summary judgment. Based on a review of the record in this case, the undersigned concludes that the amount of force used in this case was necessary to restrain Plaintiff from causing injury to staff and other prisoners. Therefore, Defendants are entitled to summary judgment on Plaintiff's excessive force claims.

Defendants assert that they are entitled to summary judgment on Plaintiff's official capacity claims against them because such claims are barred by the Eleventh Amendment. Any claims against the individually-named Defendants in their official capacities do not state a claim

upon which relief can be granted. *See Will v. Michigan Department of State Police*, 491 U.S. 58 (1989) (claims against a state agency or an official in his/her official capacity are claims against the state, and are not claims against a "person" subject to Section 1983 liability); *Frederick v. Abramajtys*, No. 94-1935, 1995 WL 564321, **1 (6th Cir. Sept. 21, 1995) (unpublished). Moreover, the Eleventh Amendment bars suit against the State or one of its agencies in federal court unless the state has given express consent, regardless of the relief sought. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), overruled in part on other grounds, *Will*, 491 U.S. 58; *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (State and Board of Corrections).[4] The State of Michigan has not consented to civil rights suits in the federal courts. *See Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). The Eleventh Amendment therefore bars official-capacity suits for damages against its employees. Therefore, any official capacity claims are properly dismissed.

Defendants also claim Plaintiff's individual capacity claims are barred by qualified immunity because Plaintiff has failed to show a violation of clearly established law. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*,

---

[4] The Sixth Circuit has held that since an official capacity suit for retroactive relief, such as monetary damages, is deemed to be against the State, whose officers are the nominal Defendants, the claim is barred by the Eleventh Amendment. *Doe v. Wigginton*, 21 F.3d 733, 736-737 (6th Cir. 1994).

167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id*. As noted above, Defendants did not violate Plaintiff's constitutional rights. Accordingly, they are entitled to qualified immunity.

In summary, in the opinion of the undersigned, Defendants have shown that they are entitled to summary judgment in this case. Accordingly, it is recommended that Defendants' Motion for Dismissal and/or Summary Judgment (Docket #36) be granted and this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from

proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within 14 days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

      /s/ Timothy P. Greeley      
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: February 11, 2011